JOHN A. MENDEZ, UNITED STATES DISTRICT JUDGE
*1085 I. INTRODUCTION
Before this Court is the United States of America's ("Plaintiff" or "United States") Motion for a Preliminary Injunction ("Motion"). Plaintiff seeks an Order from this Court enjoining enforcement of certain provisions of three laws enacted by the State of California ("Defendant" or "California")[1] through Assembly Bill 103 ("AB 103"), Assembly Bill 450 ("AB 450") and Senate Bill 54 ("SB 54"). Specifically, Plaintiff requests that this Court preliminarily enjoin the following provisions of California law: (1) California Government Code Section 12532 (as added by AB 103); (2) California Government Code Sections 7285.1 and 7285.2 and California Labor Code Sections 90.2 and 1019.2 as applied to private employers only (as added by AB 450); and (3) California Government Code Sections 7284.6(a)(1)(C), 7284.6(a)(1)(D), and 7284.6(a)(4) (as added by SB 54). Plaintiff claims that these statutes violate the Supremacy Clause of the United States Constitution, Art. VI, cl.2, and are invalid. Compl., ECF No. 1, ¶¶ 61, 63 & 65. Plaintiff argues that federal law preempts each provision because, in the area of immigration enforcement, California "lacks the authority to intentionally interfere with private citizens' [and state and local employees'] ability to cooperate voluntarily with the United States or to comply with federal obligations." Motion for Preliminary Injunction ("Mot."), ECF No. 2-1, at 2.
Plaintiff also contends that California "has no authority to target facilities holding federal detainees pursuant to a federal contract for an inspection scheme to review the 'due process' afforded during arrest and detention." Id. Accordingly, Plaintiff implores this Court to enjoin these state law provisions because they "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress and are therefore preempted by federal law." Id. at 3 (citations omitted).
Defendant vigorously opposes Plaintiff's motion for a preliminary injunction, see Opp'n, ECF No. 74, contending that these three state laws properly "allocate the use of limited law-enforcement resources, provide workplace protections, and protect the rights of [California's] residents." Id. at 1. Defendant further argues that these statutes "are consistent with applicable federal law and do not interfere with the federal government's responsibility over immigration." Id. Defendant claims that it "acted squarely within its constitutional authority when it enacted the law[s] [the United States seeks to enjoin] here[.]" Id. None of the state laws, according to Defendant, "conflict[ ] with federal law or undermine[ ] the federal government's authority or ability to undertake immigration enforcement and all are consistent with the legislative framework [of the immigration laws and regulations]." Id.
This Motion presents unique and novel constitutional issues. The Court must answer *1086 the complicated question of where the United States' enumerated power over immigration ends and California's reserved police power begins. The Court must also resolve the issue of whether state sovereignty includes the power to forbid state agents and private citizens from voluntarily complying with a federal program. Plaintiff's Motion requires this Court to carefully examine the purposes and principles of the federalist system-a system, established by the Constitution, of dual sovereignty between the States and the Federal Government whose principal benefit may be "a check on abuses of government power." Gregory v. Ashcroft, 501 U.S. 452, 458, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991).
Deciding these critical issues requires this Court to determine the proper balance between the twin powers of California and the United States. The law is clear that so long as the Federal Government is acting within the powers granted to it under the Constitution, Congress may impose its will on the States. Id. at 460, 111 S.Ct. 2395. However, if Congress is going to preempt or interfere with the decision of the people of California, "it is incumbent upon [this Court] to be certain of [Congress's] intent before finding that federal law overrides" the constitutional balance of federal and state powers. Id. (citation omitted).
If Congress intends to alter the usual constitutional balance between the States and Federal Government it must make its intention to do so unmistakably clear in the language of the statute.... Congress should make its intention clear and manifest if it intends to preempt the historic powers of [the State].
Id. at 460-61, 111 S.Ct. 2395 (quoting Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) ) (quotation marks omitted).
Applying these well-established principles of law to the present Motion, and as explained in detail below, this Court finds that AB 103, SB 54, and the employee notice provision of AB 450 are permissible exercises of California's sovereign power. With respect to the other three challenged provisions of AB 450, the Court finds that California has impermissibly infringed on the sovereignty of the United States. Plaintiff's Motion is therefore denied in part and granted in part.
II. Legal Standards
A. Preliminary Injunction Standard
Plaintiff moves the Court to enjoin enforcement of the challenged state laws. Before the Court can grant the requested relief, Plaintiff must establish-as to each challenged law-that it is likely to succeed on the merits of its claim, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in its favor, and that an injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). In the Ninth Circuit, an injunction may also be proper "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." M.R. v. Dreyfus, 697 F.3d 706, 725 (9th Cir. 2012).
Here, however, the nature of the requested relief increases Plaintiff's burden. An order enjoining the enforcement of state laws would alter the status quo and thus qualifies as a mandatory injunction. Tracy Rifle & Pistol LLC v. Harris, 118 F.Supp.3d 1182, 1194 (E.D. Cal. 2015). Plaintiff must establish that the law and facts clearly favor its position, not simply that it is likely to succeed on its claims. See Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015).
*1087 B. Supremacy Clause
In the United States, "both the National and State Governments have elements of sovereignty the other is bound to respect." Arizona v. United States, 567 U.S. 387, 398, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). The Constitution establishes the balance between these sovereign powers and the Nation's dual structure. The Supremacy Clause declares that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby[.]" U.S. Const. Art. VI, cl. 2. The Tenth Amendment limits the powers of the United States to those which the Constitution delegates, reserving the remaining powers to the States. U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."). Thus, rather than wielding a plenary power to legislate, Congress may only enact legislation under those powers enumerated in the Constitution. See Murphy v. Nat'l Collegiate Athletic Ass'n, --- U.S. ----, 138 S.Ct. 1461, 1476, 200 L.Ed.2d 854 (2018) ("The Constitution confers on Congress not plenary legislative power but only certain enumerated powers."); United States v. Morrison, 529 U.S. 598, 607, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) ("Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution.").
The United States' broad power over "the subject of immigration and the status of aliens" is undisputed. Arizona, 567 U.S. at 394, 132 S.Ct. 2492.[2] "But the Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power, whether latent or exercised." DeCanas v. Bica, 424 U.S. 351, 355, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976)superseded by statute on other grounds as recognized in Arizona, 567 U.S. at 404, 132 S.Ct. 2492.
1. Obstacle Preemption
Where Congress has the power to enact legislation it has the power to preempt state law, even in areas traditionally regulated by the States. See Arizona, 567 U.S. at 399, 132 S.Ct. 2492 ; Gregory, 501 U.S. at 460, 111 S.Ct. 2395. Courts recognize three types of preemption: express preemption, field preemption, and conflict preemption. Plaintiff's preemption argument is primarily premised on the most enigmatic member of this doctrinal family, "obstacle" preemption-a species of conflict preemption.
Conflict preemption is found in cases where it is physically impossible to comply with both federal and state regulations or in cases where the "challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " Arizona, 567 U.S. at 399-400, 132 S.Ct. 2492 (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941) ). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). The Court must examine and consider the entire scheme of the federal statute, including those elements expressed and implied. Id."If the *1088 purpose of the act cannot otherwise be accomplished-if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect-the state law must yield to the regulation of Congress within the sphere of its delegated power." Id. at 373, 120 S.Ct. 2288 (quoting Savage v. Jones, 225 U.S. 501, 533, 32 S.Ct. 715, 56 L.Ed. 1182 (1912) ).
There is a strong presumption against preemption when Congress legislates in an area traditionally occupied by the States. Chinatown Neighborhood Ass'n v. Harris, 794 F.3d 1136, 1141 (9th Cir. 2015). The Court presumes " 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.' " Arizona, 567 U.S. at 400, 132 S.Ct. 2492 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947) ); see Rice, 331 U.S. at 230, 67 S.Ct. 1146 (When Congress legislates in a "field which the States have traditionally occupied[,] [ ] we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."). Such purpose must be "unmistakably clear in the language of the statute," Gregory, 501 U.S. at 460, 111 S.Ct. 2395 (quoting Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) ), as must the presence of an obstacle. Chinatown Neighborhood Ass'n, 794 F.3d at 1141 ("[T]he California statute cannot be set aside absent 'clear evidence' of a conflict."); see also Savage, 225 U.S. at 533, 32 S.Ct. 715 (1912) ("In other words, [the intent to supersede the State's exercise of its police power] is not to be implied unless the act of Congress, fairly interpreted, is in actual conflict with the law of the state."). "Mere possibility of inconvenience" is not a sufficient obstacle-the repugnance must be "so direct and positive that the two acts cannot be reconciled or consistently stand together." See Goldstein v. California, 412 U.S. 546, 554-55, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973) (quoting The Federalist No. 32, p. 243 (B. Wright ed. 1961) ); Kelly v. Washington ex rel. Foss Co., 302 U.S. 1, 10, 58 S.Ct. 87, 82 L.Ed. 3 (1937).
The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq., is "the comprehensive federal statutory scheme for regulation of immigration and naturalization." DeCanas, 424 U.S. at 353, 96 S.Ct. 933. Congress has amended and supplemented the scheme over the years by passing statutes like the Immigration Reform and Control Act ("IRCA") and the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA" or "IIRAIRA"), among others. Plaintiff argues that the INA, as amended, preempts the state laws challenged in this case. Mot. at 2-3, 11-32.
2. Intergovernmental Immunity
The Supremacy Clause gives rise to another doctrine restricting States' power: the doctrine of intergovernmental immunity. Under this line of precedent, a State may not regulate the United States directly or discriminate against the Federal Government or those with whom it deals. North Dakota v. United States, 495 U.S. 423, 435, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990) (plurality op.). "Since a regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself, the Court has required that the regulation be one that is imposed on some basis unrelated to the object's status as a Government contractor or supplier, that is, that it be imposed equally on other similarly situated constituents of the State." North Dakota, 495 U.S. at 437-38, 110 S.Ct. 1986. The doctrine protects private entities and individuals even when the burdens imposed *1089 upon them are not then passed on to the Federal Government. See Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 814-15, 817, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) (finding a state tax system that favored state retirees over federal retirees violated intergovernmental immunity even though the tax arguably did not interfere with the Federal Government's ability to perform its governmental functions) (citing Phillips Chem. Co. v. Dumas Indep. Sch. Dist., 361 U.S. 376, 387, 80 S.Ct. 474, 4 L.Ed.2d 384 (1960) ). Though the doctrine finds its most comfortable repose in tax cases, courts have extended its reach to other contexts. See, e.g., North Dakota, 495 U.S. 423, 110 S.Ct. 1986 (analyzing North Dakota's liquor control regulations); Boeing Co. v. Movassaghi, 768 F.3d 832 (9th Cir. 2014) (analyzing a California law governing cleanup of a federal nuclear site); In re Nat'l Sec. Agency Telecomms. Records Litig., 633 F.Supp.2d 892 (N.D. Cal. 2007) (analyzing state investigations into telecommunication carriers that concerned the alleged disclosures of customer records to the NSA).
A targeted regulation is not invalid simply because it distinguishes between the two sovereigns. "The State does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." North Dakota, 495 U.S. at 437-38, 110 S.Ct. 1986 (quoting Washington v. United States, 460 U.S. 536, 544-545, 103 S.Ct. 1344, 75 L.Ed.2d 264 (1983) ). Accordingly, a regulation should not be struck down unless it burdens the Federal Government (or those dealing with the Federal Government) more so than it does others. North Dakota, 495 U.S. at 439, 110 S.Ct. 1986 (finding a regulatory regime that did not disfavor the Federal Government could not be considered to discriminate against it). Furthermore, a regulation will survive if significant differences between the two classes justify the burden. Davis, 489 U.S. at 815-17, 109 S.Ct. 1500. "The relevant inquiry is whether the inconsistent [ ] treatment is directly related to, and justified by, significant differences between the two classes." Id. at 816, 109 S.Ct. 1500 (citation and quotation marks omitted).
C. Tenth Amendment
The Tenth Amendment limits Congress's legislative authority to those powers enumerated in the Constitution. Absent from this list of powers "is the power to issue direct orders to the governments of the States." Murphy, 138 S.Ct. at 1476. Thus, in addition to erecting a higher wall against preemption, the Tenth Amendment restrains Congress's ability to impose its will upon the States directly.
The Supreme Court's so-called "anticommandeering" doctrine recognizes this check on Congressional power. Congress may not directly compel States to enact a regulation or enforce a federal regulatory program, conscript state officers for such purpose, or prohibit a State from enacting laws. See New York v. United States, 505 U.S. 144, 188, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) ("The Federal Government may not compel the States to enact or administer a federal regulatory program."); Printz v. United States, 521 U.S. 898, 935, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) ("Today we hold that Congress cannot circumvent that prohibition by conscripting the State's officers directly."); Murphy, 138 S.Ct. at 1478 ("The PASPA provision at issue here-prohibiting state authorization of sports gambling-violates the anticommandeering rule. That provision unequivocally dictates what a state legislature may and may not do."). Even requiring state officers to perform discrete, ministerial tasks violates the doctrine. Printz, 521 U.S. at 929-30, 117 S.Ct. 2365.
*1090 The reasons behind the anticommandeering doctrine are several. See Murphy, 138 S.Ct. at 1477 (Part III-B). First, the rule reflects "the Constitution's structural protections of liberty." Printz, 521 U.S. at 921, 117 S.Ct. 2365. By balancing power between the sovereigns, it prevents the accumulation of excessive power and "reduce[s] the risk of tyranny and abuse from either front." Gregory, 501 U.S. at 458, 111 S.Ct. 2395. Second, the doctrine prevents Congress from passing the costs and burdens of implementing a federal program onto the States. Printz, 521 U.S. at 930, 117 S.Ct. 2365. Third, the doctrine promotes accountability; it ensures that blame for a federal program's burdens and defects falls on the responsible government. Id. ("And it will likely be the [state chief law enforcement officers], not some federal official, who will be blamed for any error (even one in the designated federal database) that causes a purchaser to be mistakenly rejected."). These reasons, among others, counsel that courts must adhere to the strictures of the rule even where a Congressional act serves important purposes, is most efficiently effectuated through state officers, or places a minimal burden upon the State. Id. at 932, 117 S.Ct. 2365. "It is the very principle of separate state sovereignty that such a law offends, and no comparative assessment of the various interests can overcome that fundamental defect." Id.
III. OPINION
A. Likelihood of Success on the Merits
1. Assembly Bill 103
Approved by the Governor and filed with the Secretary of State on June 27, 2017, Assembly Bill 103 added Section 12532 to the California Government Code and directs the Attorney General to review and report on county, local, and private locked detention facilities in which noncitizens are housed or detained for purposes of civil immigration proceedings in California. Cal. Gov't Code § 12532. It directs the Attorney General to conduct a review of such facilities by March 1, 2019. Cal. Gov't Code § 12532(b). This review must include a review of the conditions of confinement, the standard of care and due process provided to the individuals housed or detained in the facilities, and the circumstances around their apprehension and transfer to the facility. Cal. Gov't Code § 12532(b)(1). Additionally-by the same deadline-the Attorney General must provide a comprehensive report of his findings to the Legislature, the Governor, and the public. Cal. Gov't Code § 12532(b)(2). In furtherance of this objective, the Attorney General "shall be provided all necessary access for the observations necessary to effectuate [these] reviews ..., including, but not limited to, access to detainees, officials, personnel, and records." Cal. Gov't Code § 12532(c).
Plaintiff argues that this review and reporting requirement interferes with the Federal Government's exclusive authority in the area of immigrant detention. Mot. at 18-19. Because the decision whether to pursue removal is entrusted to the Federal Government's discretion, California's efforts to assess the process afforded to immigrant detainees poses an obstacle, Plaintiff contends, to administering the federal immigration scheme. Id. at 19-20. "Federal law," it argues, "does not contemplate any role for the facility itself, or for states and localities, in determining which aliens are properly subject to detention or the terms and conditions of that detention."Id. at 18.
Defendant responds that the Legislature passed AB 103 in reaction to growing concerns of egregious conditions in facilities housing civil detainees. Opp'n at 6 (citing Decl. of Holly Cooper and Def. RFJN, Exh. K (Office of Inspector General, Management *1091 Alert on Issues Requiring Immediate Action at the Theo Lacy Facility in Orange, California, OIG-17-43-MA, March 6, 2017) ). Several amici echo these concerns. See See Br. for Nat'l Health Law Program, et al., as Amici Curiae, ECF No. 104; Br. for Immigrant Legal Res. Ctr., et al., as Amici Curiae, ECF No. 126; Br. for Nat'l Immigr. Law Ctr., et al., as Amici Curiae, ECF No. 136. Defendant argues the review and reporting AB 103 requires fall well within the Attorney General's broad constitutional powers to enforce state laws and conduct investigations relating to subjects under his jurisdiction. Opp'n at 6 (citing Cal. Const. art. V, § 13 ; Cal. Gov't Code § 11180 ). Rather than enacting a new regulatory scheme or imposing substantive requirements, AB 103 "simply authorizes funding" to address issues the Attorney General already has the authority to review in response to increased concerns in this area. Id. at 7, 30; June 20, 2018, Hearing Transcript ("Trans."), ECF No. 189, at 25:2-13.
The Court finds no indication in the cited portions of the INA that Congress intended for States to have no oversight over detention facilities operating within their borders. See 8 U.S.C. § 1231(g)(1)-(2) ; 8 U.S.C. § 1103(a)(11). Indeed, the detention facility contracts Defendant provided to the Court expressly contemplate compliance with state and local law. Melton Decl., Exhs. M-S (filed under seal), ECF No. 81. These contracts demonstrate that California retains some authority over the detention facilities. Contrary to Plaintiff's characterization, AB 103's review process does not purport to give California a role in determining whether an immigrant should be detained or removed from the country. The directive contemplates increased transparency and a report that may serve as a baseline for future state or local action. At this point, what that future action might be is subject to speculation and conjecture.
The review and reporting requirement contemplated in AB 103 is different from the state licensing requirements struck down in Leslie Miller and Gartrell. See Leslie Miller, Inc. v. Arkansas, 352 U.S. 187, 190, 77 S.Ct. 257, 1 L.Ed.2d 231 (1956) ; Gartrell Const. Inc. v. Aubry, 940 F.2d 437 (9th Cir. 1991). In Leslie Miller, the Supreme Court held that an Arkansas statute imposing licensing requirements on a federal contractor interfered with the federal government's power to select contractors and schedule construction, and therefore conflicted with the federal law regulating procurement. 352 U.S. at 190, 77 S.Ct. 257. Thirty-five years later, the Ninth Circuit upheld an injunction of a similar licensing requirement as applied to a federal contractor in California. Gartrell, 940 F.2d at 438. It found that the Federal Government already considered many of the factors involved in the State's licensing determination during its own "responsibility" determination and held that, under Leslie Miller, the licensing requirement was preempted. Id. at 438-41. The Circuit reasoned: "Because the federal government made a direct determination of Gartrell's responsibility, California may not exercise a power of review by requiring Gartrell to obtain state licenses." Id. at 441.
Unlike state licensing regulations, AB 103 does not impose any substantive requirements upon detention facilities. For all its bark, the law has no real bite. It directs the Attorney General to channel an authority he already wields to an issue of recent State interest. The facility need only provide access for these reviews, which is of little or no consequence. Given the Attorney General's power to conduct investigations related to state law enforcement-a power which Plaintiff concedes, Trans. at 15:11-16:5-the Court does not find this directive in any way constitutes an obstacle to the federal government's *1092 enforcement of its immigration laws or detention scheme.
There is, however, one federal regulation that might directly conflict with Government Code Section 12532(c). Under 8 C.F.R. § 236.6, no one-including state or local government entities or any privately operated detention facility-who obtains information relating to any detainee, "shall disclose or otherwise permit to be made public the name of, or other information relating to, such detainee." It continues:
Such information shall be under the control of the Service and shall be subject to public disclosure only pursuant to the provisions of applicable federal laws, regulations and executive orders. Insofar as any documents or other records contain such information, such documents shall not be public records. This section applies to all persons and information identified or described in it, regardless of when such persons obtained such information, and applies to all requests for public disclosure of such information, including requests that are the subject of proceedings pending as of April 17, 2002.
8 C.F.R. § 236.6 (Information regarding detainees).
According to Plaintiff, this regulation establishes that information regarding detainees belongs solely to the Federal Government and that facilities violate the regulation by turning such information over to the Attorney General. Mot. at 22; Reply at 9. For additional support, Plaintiff quotes the supplementary information published with the rule in the Federal Register, wherein the Immigration and Naturalization Service explained that "the rule guarantees that information regarding federal detainees will be released under a uniform federal scheme rather than the varying laws of the fifty states." 68 Fed. Reg. 4364, 4366 (Jan. 29, 2003).
Defendant counters that there is no conflict because the regulation prohibits only the public disclosure of information about detainees, not disclosure to other government entities. Opp'n at 30-31. Because the Attorney General "conducts these reviews in his capacity as the chief law officer of the State," and "not as a member of the public," Defendant maintains there is no conflict. Id. Defendant points out that AB 103, on its face, does not provide for disclosure of detainee information to the public. Id. Further, such disclosure is unlikely because "much if not all" of the information in question remains confidential under state law. Id.
The Court agrees with Defendant that there is no conflict apparent on the face of Section 12532(c). The federal regulation at issue is most naturally read to prohibit public disclosures of information, not the provision of information to other governmental entities or law enforcement. 8 C.F.R. § 236.6. The information published in the Federal Register supports this interpretation. 68 Fed. Reg. 4364, 4364 ("Summary: This final rule governs the public disclosure ... of the name and other information relating to any immigration detainee[.]"), 4365 ("These provisions plainly authorize the Attorney General ... to provide by regulation that persons housing INS detainees on behalf of the federal government shall not publicly disclose the names and other information regarding those detainees."), 4367 (" Executive Order 13132 [:] ... This rule merely pertains to the public disclosure of information concerning Service detainees .... In effect, the rule will relieve state or local government entities of responsibility for the public release of information relating to any immigration detainee being housed or otherwise maintained or provided service on behalf of the Service. Instead, the rule reserves that responsibility to the Service with regard to all Service detainees.").
*1093 Plaintiff's cited cases do not broaden the scope of the rule; each case concerned public disclosure of detainee information, not the provision of information to another government entity. See Voces De La Frontera, Inc. v. Clarke, 373 Wis. 2d 348, 891 N.W.2d 803 (2017) (finding records concerning detainees statutorily exempt from disclosure under Wisconsin's public records law); Comm'r of Corr. v. Freedom of Info. Comm'n, 307 Conn. 53, 52 A.3d 636 (2012) (finding former detainee's records exempt from Connecticut's Freedom of Information Act); ACLU of New Jersey v. Cnty. of Hudson, 352 N.J. Super. 44, 799 A.2d 629 (2002) (finding § 236.6 preempts New Jersey's Right-to-Know Law to the extent it requires public disclosure of information regarding INS detainees).
Plaintiff nevertheless contends that California's Attorney General is a member of the public as contemplated by the regulation. But Plaintiff did not identify, and the Court is unaware of, any judicial decision interpreting the regulation to restrict information sharing with government entities or law enforcement. The regulation contemplates that such information would fall into the hands of state and local government entities through their contractual relationships with the federal government. In light of the California Attorney General's role in state law enforcement, and without any authority to the contrary, the Court does not find a conflict, express or implied, between the access required under Government Code Section 12532(c) and 8 C.F.R. § 236.6.
Finally, the Court finds AB 103 is not invalid under the doctrine of intergovernmental immunity. Plaintiff argues the law violates this doctrine because it imposes a review scheme on facilities contracting with the federal government, only. This characterization is valid. However, the burden placed upon the facilities is minimal and Plaintiff's evidence does not show otherwise. See Homan Decl. at ¶ 60 (summarily stating that the inspections are burdensome). Importantly, the review appears no more burdensome than reviews required under California Penal Code §§ 6030, 6031.1. Thus, even if AB 103 treats federal contractors differently than the State treats other detention facilities, Plaintiff has not shown the State treats other facilities better than those contractors. North Dakota, 495 U.S. at 437-38, 110 S.Ct. 1986 ("The State does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them.").
Plaintiff is not likely to succeed on the merits of this claim. Its motion for a preliminary injunction as to AB 103 is denied.
2. Assembly Bill 450
The regulation of employment traditionally falls within the States' police power:
States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State. Child labor laws, minimum and other wage laws, laws affecting occupational health and safety, and workmen's compensation laws are only a few examples.
DeCanas v. Bica, 424 U.S. 351, 356, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976) (decision superseded by statute).
AB 450 imposes various requirements on public and private employers with respect to immigration worksite enforcement actions. 2017 Cal. Stat., ch. 492 (A.B. 450). It prohibits employers from providing voluntary consent to an immigration enforcement agent to enter nonpublic areas of a place of labor or to access, review, or obtain the employer's employee records. Cal. Gov't Code §§ 7285.1, 7285.2. It requires employers to provide notice to their employees of any impending I-9 (or other employment record) inspection within 72 *1094 hours of receiving notice of that inspection. Cal. Lab. Code § 90.2. Lastly, AB 450 prohibits employers from reverifying the employment eligibility of current employees when not required by federal law. Cal. Lab. Code § 1019.2. As passed, AB 450 states that its provisions are severable. 2017 Cal. Stat., ch. 492, Sec. 6 (A.B. 450).
Plaintiff challenges AB 450 as applied to private employers only, Compl. ¶¶ 35, 61, Trans. at 10:2-19, arguing that the above-noted additions to state law pose an obstacle to immigration enforcement objectives under the Immigration Reform and Control Act ("IRCA") and the INA.
"Congress enacted IRCA as a comprehensive framework for 'combatting the employment of illegal aliens.' " Arizona, 567 U.S. at 404, 132 S.Ct. 2492. IRCA imposes criminal sanctions on employers who knowingly hire, recruit, refer, or continue to employ unauthorized workers, but does not impose criminal sanctions on employees. 8 U.S.C. § 1324a ; Arizona, 567 U.S. at 404-07, 132 S.Ct. 2492 ("The correct instruction to draw from the text, structure, and history of IRCA is that Congress decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment."). The statute authorizes the Attorney General to establish procedures for complaints and investigations. 8 U.S.C. § 1324a(e)(1). It also confers authority upon immigration officers and administrative law judges to be given "reasonable access to examine evidence of any person or entity being investigated" and to compel by subpoena the attendance of witnesses and the production of evidence. 8 U.S.C. § 1324a(e)(2).
The Supreme Court has found IRCA preempts additional penalties on employers (via express preemption) and criminal sanctions on unauthorized workers for seeking or performing work (via conflict preemption). Arizona, 567 U.S. 387, 132 S.Ct. 2492. Courts have held IRCA does not preempt: a provision of Arizona law allowing suspension and revocation of businesses licenses based on employing unauthorized workers, Chamber of Commerce of U.S. v. Whiting, 563 U.S. 582, 131 S.Ct. 1968, 179 L.Ed.2d 1031 (2011) ; an Arizona law requiring that every employer verify the employment eligibility of hired employees through the E-Verify system, id. (as amended by IIRIRA); and various labor protections, with some limits on the damages an unlawfully employed immigrant is entitled to receive, see, e.g., Salas v. Sierra Chem. Co., 59 Cal.4th 407, 173 Cal.Rptr.3d 689, 327 P.3d 797 (2014) (holding the State's extension of employee protections to all workers regardless of immigration status is preempted only to the extent it authorizes lost pay awards for any period after an employer discovers the employee's ineligibility to work in the United States).
a. Prohibitions on Consent
The Court finds AB 450's prohibitions on consent, Cal. Gov't Code §§ 7285.1, 7285.2., troubling due to the precarious situation in which it places employers. Trans. at 92:9-18. Despite that concern, the question before the Court is limited to Plaintiff's Supremacy Clause claim and the relationship between the State and the Federal Government.
Plaintiff's preemption argument rests on the notion that Congress presumed immigration enforcement officers could gain access to worksites by consent of the employer. Mot. at 11-13. Plaintiff contends the entire enforcement scheme is premised on this authority. Id.
Defendant does not dispute that immigration enforcement agents could, prior to AB 450, gain access to nonpublic areas of a worksite through employer consent. In enacting AB 450, the state legislators acknowledged that immigration officers could do so under existing law. See Pl. Exh. J (Senate Judiciary Committee Report), *1095 ECF No. 171-10. But, Defendant argues, the entry and access provisions do not conflict with IRCA because "IRCA was not intended to diminish states' labor protections." Opp'n at 26. Because AB 450 permits entry and access pursuant to judicial warrant (or subpoena, for documents), or when otherwise required by federal law, Defendant claims the law does not deny the "reasonable access to examine evidence" required under IRCA. See 8 U.S.C. § 1324a(e)(2).
The arguments are wanting on both sides. By attempting to narrow the Court's focus to the criminal penalties at issue under IRCA, Defendant fails to acknowledge that immigration enforcement officers might also seek to investigate civil violations of the immigration laws or pursue investigative activities outside of IRCA's provisions. As Plaintiff pointed out at the June 20, 2018, hearing on its Motion, Trans. at 114:20-115:11, IRCA added new sections to the already existing law governing immigration enforcement activities; Defendant did not address any of these other grants of power. Further, Defendant cites no authority for its proposition that AB 450's judicial warrant requirement and savings clause together constitute "reasonable access" under IRCA. Irrespective of the State's interest in protecting workers, the Court finds that the warrant requirement may impede immigration enforcement's investigation of employers or other matters within their authority to investigate.
Even though these two subsections of AB 450 interfere with immigration enforcement's historical practices, the Court hesitates to find the statutes preempted. In preemption analysis, the Court presumes " 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.' " Arizona, 567 U.S. at 400, 132 S.Ct. 2492. Laws governing labor relations and the workplace generally fall within the States' police powers. Congress has not expressly authorized immigration officers to enter places of labor upon employer consent, nor has Congress authorized immigration enforcement officers to wield authority coextensive with the Fourth Amendment. Although Plaintiff's cited cases show instances of immigration enforcement lawfully exercising its investigative authority in accordance with the Fourth Amendment, none of these cases establish that Congress has expressly or impliedly granted immigration enforcement agents such authority. See I.N.S. v. Delgado, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) (noting that the federal immigration officers were lawfully present at a worksite because they obtained either a warrant or the employer's consent to their entry); Zepeda v. I.N.S., 753 F.2d 719, 725 (9th Cir. 1983) (explaining that Congress, by authorizing the INS "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" without a warrant, authorized the INS "to question aliens to the fullest extent permissible under the [F]ourth [A]mendment") (citing 8 U.S.C. § 1357(a)(1) ); Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson, 799 F.2d 547 (9th Cir. 1986) (striking part of an injunction order that required every INS warrant to "contain a specific description of each suspect to be questioned and be based on 'probable cause to believe that such person is an illegal alien' " because it misstated the standard for non-detentive questioning"). Nor do these cases show consent to be an essential pillar of the enforcement regime. Certainly, obstacle preemption may be "implied," but precedent counsels against reading Congressional "presumptions" or "assumptions" into the statutes without a more robust record than that presently before the Court.
*1096 Ultimately, however, the Court need not resolve the preemption issue because Plaintiff is likely to succeed on its Supremacy Clause claim under the intergovernmental immunity doctrine. The doctrine applies in these circumstances even though the laws regulate employers and not the Federal Government directly. See Davis, 489 U.S. at 814, 817, 109 S.Ct. 1500 ; Phillips Chem. Co., 361 U.S. at 387, 80 S.Ct. 474 (holding that state taxes imposed on lessees of federal land were invalid where those taxes were more burdensome than taxes imposed on lessees of state land). For those employers who choose to allow immigration enforcement agents to enter or access documents, AB 450 imposes significant and escalating fines. See Cal. Gov't Code § 7285.1(b) (subjecting employers to a fine of $2,000 to $5,000 for a first violation and $5,000 to $10,000 for each subsequent violation); Cal. Gov't Code § 7285.2(b) (same). These fines inflict a burden on those employers who acquiesce in a federal investigation but not on those who do not.
Defendant argues the application of the doctrine in these circumstances would expand its reach. It notes that the intergovernmental immunity cases evaluating indirect discrimination have typically concerned laws that imposed burdens on entities contracting with, or supplying something to, the Federal Government, thus "dealing" with the United States in an economic sense. Trans. at 93:1-95:6.
The Court is not convinced that the term "deal" is circumscribed in the manner Defendant suggests. As in other intergovernmental immunity cases, the imposition of civil fines (like the imposition of taxes) turns on whether an employer chooses to work with federal immigration enforcement. These fines are a clear attempt to "meddl[e] with federal government activities indirectly by singling out for regulation those who deal with the government." See In re NSA, 633 F.Supp.2d at 903. The Court does not find Defendant's argument that the law is neutral convincing. Opp'n at 29 (arguing the law applies to "any person or entity seeking to enforce the civil immigration laws, whether federal, state, or local"). Given that immigration enforcement is the province of the Federal Government, it demands no stretch of reason to see that Government Code Sections 7285.1 and 7285.2, in effect, target the operations of federal immigration enforcement.
The Court finds that a law which imposes monetary penalties on an employer solely because that employer voluntarily consents to federal immigration enforcement's entry into nonpublic areas of their place of business or access to their employment records impermissibly discriminates against those who choose to deal with the Federal Government. The law and facts clearly support Plaintiff's claim as to these two subsections and Plaintiff is likely to succeed on the merits.
b. Notice Requirement
AB 450 also added a provision to the California Labor Code requiring employers to provide notice to their employees "of any inspections of I-9 Employment Eligibility Verification forms or other employment records conducted by an immigration agency within 72 hours of receiving notice of the inspection." Cal. Lab. Code § 90.2(a)(1). It specifies the contents of the requisite notice and instructs employers to provide a copy of the inspection notice to any employee upon reasonable request. Id. § 90.2(a)(1)-(3).
Labor Code Section 90.2 also requires employers to provide each current, affected employee with the results of the inspection within 72 hours of receipt, including any obligations of the employer and affected employee arising from the results. Id. § 90.2(b). The statute defines an "affected *1097 employee" as "an employee identified by the immigration agency inspection results to be an employee who may lack work authorization, or an employee whose work authorization documents have been identified by the immigration agency inspection to have deficiencies." Id. § 90.2(b)(2). Employers are subject to civil penalties for violations, except that the section "does not require a penalty to be imposed upon an employer or person who fails to provide notice to an employee at the express and specific direction or request of the federal government." Id. § 90.2(c).
Plaintiff argues that this notice provision stands as an obstacle to the implementation of federal law by aiming to thwart immigration regulation. Reply at 5. "Obviously," it argues, investigations "will be less effective if the targets of the investigations are warned ahead of time and kept abreast of the status of the United States' enforcement efforts." Mot. at 17.
This argument convolutes the purposes of IRCA enforcement actions. IRCA primarily imposes obligations and penalties on employers, not employees. See 8 U.S.C. § 1324a. The new California Labor Code section only requires employers to provide notice to employees if the employer itself has received notice of an impending inspection. The "targets" of the investigation have thus already been "warned." Pursuant to federal regulations, employers are to be given at least three business days' notice prior to an I-9 inspection. See 8 C.F.R. § 274a.2(b)(2)(ii). The state law merely extends this prior notice to employees. Given IRCA's focus on employers, the Court finds no indication-express or implied-that Congress intended for employees to be kept in the dark.
The Court declines to adopt Plaintiff's cynical view of the law. As amici point out, notice provides employees with an opportunity to cure any deficiencies in their paperwork or employment eligibility. See Br. for Cal. Labor Fed'n, et al., as Amici Curiae, ECF No. 134. Federal law affords such a courtesy to employers; the Court does not view an extension of that courtesy to employees as an attempt to thwart IRCA's goals.
The notice provision also does not violate the intergovernmental immunity doctrine. Unlike the prohibitions on consent, violations of this provision do not turn on the employer's choice to "deal with" (i.e., consent to) federal law enforcement. An employer is not punished for its choice to work with the Federal Government, but for its failure to communicate with its employees. This requirement does not readily fit into the contours of the intergovernmental immunity doctrine and application would stretch the doctrine beyond its borders. The Court thus finds no merit to Plaintiff's Supremacy Clause claim as to California Labor Code Section 90.2. Plaintiff's motion for a preliminary injunction as to this subdivision of AB 450 is denied.
c. Reverification Prohibition
California Labor Code Section 1019.2 limits an employer's ability to reverify an employee's employment eligibility when not required by law:
Except as otherwise required by federal law, a public or private employer, or a person acting on behalf of a public or private employer, shall not reverify the employment eligibility of a current employee at a time or in a manner not required by Section 1324a(b) of Title 8 of the United States Code.
Cal. Lab. Code § 1019.2(a). An employer that violates this subsection is subject to a civil penalty of up to $10,000. Id. § 1019.2(b)(1). The law should not be "interpreted, construed, or applied to restrict or limit an employer's compliance with a memorandum of understanding governing *1098 the use of the federal E-Verify system." Id. § 1019.2(c).
Under IRCA, an employer faces liability for continuing to employ an immigrant in the United States knowing that the immigrant is (or has become) unauthorized with respect to such employment. 8 U.S.C. § 1324a(2). Plaintiff argues that this continuing obligation to avoid knowingly employing an unauthorized immigrant worker conflicts with California's prohibition on reverification. Mot. at 17-18 (citing New El Rey Sausage Co., Inc. v. I.N.S., 925 F.2d 1153 (9th Cir. 1991) ). Defendant responds that there is no obstacle because the state law contains an express savings clause for instances where reverification is required by federal law and does not limit an employer's compliance with a memorandum of understanding governing the use of the federal E-Verify system. Opp'n at 26-28.
The Court finds Plaintiff is likely to succeed on the merits of this claim, with the caveat that a more complete evidentiary record could impact the Court's analysis at a later stage of this litigation. Neither party provided the Court with much information on how the verification system currently works in practice and how the new law does or does not change those practices. Based on a plain reading of the statutes, the prohibition on reverification appears to stand as an obstacle to the accomplishment of Congress's purpose in enacting IRCA. See Arizona, 567 U.S. at 399-400, 132 S.Ct. 2492. Congress could have chosen to tie employer liability to instances when an employer fails to verify employment eligibility when required to do so by federal law. Instead, Congress broadened liability to encompass situations when an employer knows one of its immigrant employees is or has become unauthorized to work and continues to employ them. In a single act, Congress premised criminal sanction on an employer's subjective knowledge and established a system through which employers could verify compliance with the law. As the Ninth Circuit explained in New El Rey Sausage Co.:
The inclusion in the statute of section 1324a(b)'s verification system demonstrates that employers, far from being allowed to employ anyone except those whom the government had shown to be unauthorized, have an affirmative duty to determine that their employees are authorized. This verification is done through the inspection of documents. Notice that these documents are incorrect places the employer in the position it would have been if the alien had failed to produce the documents in the first place: it has failed to adequately ensure that the alien is authorized.
925 F.2d at 1158. Prohibiting employers from reverifying employment eligibility complicates the subjective element of the crime; e.g., could an employer who might otherwise be found to "know" that one of its employees lacks authorization find shelter behind the state law because it could not confirm its suspicion? The law frustrates the system of accountability that Congress designed.
Based on the authority and evidence before the Court at this juncture, which clearly support Plaintiff's claim, the Court finds Plaintiff is likely to succeed on the merits of its Supremacy Clause claim against California Labor Code Section 1019.2(a).
3. Senate Bill 54
SB 54 added several subsections to the California Government Code. Plaintiff seeks to enjoin three of these subsections. The first two challenged by Plaintiff prohibit state law enforcement agencies from sharing certain information for immigration enforcement purposes:
(a) California law enforcement agencies shall not:
*1099 (1) Use agency or department moneys or personnel to investigate, interrogate, detain, detect, or arrest persons for immigration enforcement purposes, including any of the following:
...
(C) Providing information regarding a person's release date or responding to requests for notification by providing release dates or other information unless that information is available to the public, or is in response to a notification request from immigration authorities in accordance with Section 7282.5. Responses are never required, but are permitted under this subdivision, provided that they do not violate any local law or policy.
(D) Providing personal information, as defined in Section 1798.3 of the Civil Code, about an individual, including, but not limited to, the individual's home address or work address unless that information is available to the public.
Cal. Gov't Code § 7284.6(a)(1)(C) & (D). Subsection (e) contains a savings clause expressly exempting the exchange of information pursuant to 8 U.S.C. §§ 1373 and 1644. Cal. Gov't Code § 7284.6(e).
Plaintiff also challenges the subsection limiting transfers of individuals to immigration authorities:
(a) California law enforcement agencies shall not:
...
(4) Transfer an individual to immigration authorities unless authorized by a judicial warrant or judicial probable cause determination, or in accordance with Section 7282.5.
Cal. Gov't Code § 7284.6(a)(4). California Government Code Section 7282.5 defines the circumstances in which law enforcement officials have discretion to cooperate with immigration authorities as referenced in subparagraphs (a)(1)(C) and (a)(4) above, i.e., convictions for certain offenses.
a. Direct Conflict with Section 1373
The primary, and most direct, conflict Plaintiff identifies is that between the information sharing provisions and 8 U.S.C. § 1373 (" Section 1373").[3] Section 1373(a) bars States from prohibiting, or in any way restricting, "any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." (emphasis added). Arguing for a broad interpretation of the phrase "information regarding the citizenship or immigration status, lawful or unlawful, of any individual," Plaintiff contends the prohibitions on sharing release dates and home and work addresses violates Section 1373.
Defendant argues that Section 1373 is unconstitutional under the Supreme Court's recent holding in Murphy, 138 S.Ct. 1461 (2018) ; see Supp. Br., ECF No. 156. The Court in Murphy held that Congress cannot dictate what a state legislature may and may not do, "as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals." Id. at 1482. The decision clarified that the Court's anticommandeering precedent extends to prohibitions on state legislative action. Section 1373 does just what Murphy proscribes: it tells States they may not prohibit (i.e., through legislation) the sharing of information regarding immigration status with the INS or other government entities.
Plaintiff argues that Murphy's holding-and the anticommandeering rule generally-does not reach statutes requiring information *1100 sharing between government entities. Reply at 17-22. Plaintiff points to a number of federal statutes that require States to convey information to the Federal Government. Reply at 19 n.14. For additional support, it cites Reno v. Condon for the principle that a regulation on States as the owners of databases does not violate the Tenth Amendment. Reply at 18; 528 U.S. 141, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000). Plaintiff also notes that the Printz opinion distinguished federal laws regulating the provision of information to the federal government from regulations requiring forced participation of the States in administering a federal program.
Reno v. Condon involved a constitutional challenge to the Driver's Privacy Protection Act ("DPPA"), which bars States from disclosing a driver's personal information without the driver's consent. 528 U.S. 141, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000) ; see 18 U.S.C. § 2721(a) ("A State department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity personal information ... about any individual obtained by the department in connection with a motor vehicle record[.]"). The Supreme Court held the provision does not run afoul of the Tenth Amendment:
[T]he DPPA does not require the States in their sovereign capacity to regulate their own citizens. The DPPA regulates the States as the owners of data bases. It does not require the South Carolina Legislature to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals. We accordingly conclude that the DPPA is consistent with the constitutional principles enunciated in New York and Printz.
Id. at 150, 120 S.Ct. 666. The Court rejected South Carolina's argument that the DPPA is unconstitutional for its exclusive regulation of the States, finding the Act to be generally applicable but not deciding whether general applicability is required to survive constitutional scrutiny. Id.
Plaintiff's second source of support is dicta from Printz, 521 U.S. 898, 117 S.Ct. 2365 (1997). The Printz Court evaluated a federal statute that required state law enforcement officers to assist in administering a federal regulatory scheme. In describing the issues to be resolved, Justice Scalia wrote:
The Government points to a number of federal statutes enacted within the past few decades that require the participation of state or local officials in implementing federal regulatory schemes.... [Some of these statutes], which require only the provision of information to the Federal Government, do not involve the precise issue before us here, which is the forced participation of the States' executive in the actual administration of a federal program.
Id. at 918, 117 S.Ct. 2365. Justice Scalia expressly distinguished the laws under consideration in Printz from laws that require the provision of information to the Federal Government. Thus, Printz left open the question of whether required information sharing could constitute commandeering.
Defendant would have this Court follow the lead of the district court in City of Philadelphia v. Sessions. No. 17-3894, 309 F.Supp.3d 289, 2018 WL 2725503 (E.D. Pa. June 6, 2018). That court rejected Plaintiff's same-or substantially similar-arguments and found Section 1373 unconstitutional under Murphy. Id. at 324-31, at *28-33. It held that "on their face, [ Section 1373(a) and (b) ] regulate state and local government entities and officials, which is fatal to their constitutionality under the Tenth Amendment." Id. at 329, at *32. The *1101 district court distinguished Reno, explaining that Reno did not involve a "statute that commanded state legislatures to enact or refrain from enacting state law." Id. (noting the Murphy Court's discussion of Reno ). It also refused to put much weight in the cited dicta from Printz, finding that Printz's holding supports the court's conclusion as to Section 1373.
The Court finds the constitutionality of Section 1373 highly suspect. Like the district court in City of Philadelphia, the Court reads Section 1373 to dictate what states may and may not do, in contravention of the Tenth Amendment. The more critical question, however, is whether required information sharing constitutes commandeering at all. Printz left this question open.
One view, which amici, the California Partnership to End Domestic Violence and the Coalition for Humane Immigrant Rights, articulate, is that the context of the information sharing affects the commandeering inquiry. See Br. for Cal. P'ship to End Domestic Violence and the Coal. for Humane Immigrant Rights, as Amici Curiae, ECF No. 182. Amici argue "purely ministerial reporting requirements" might not constitute commandeering, but "forced information sharing, where it facilitates the on-the-ground, day-to-day administration of a federal program, runs afoul of the anti-commandeering rule." Id. at 7. They argue that "none of [the] examples [Plaintiff cites to show that Congress frequently calls on states to share relevant information] remotely resembles a system of state officers performing daily services for immigration agents." Id. at 8. The Court agrees-cautiously, because these other provisions were not heavily briefed-that the information sharing provisions cited in footnote 14 of Plaintiff's Reply do not appear to approximate the level of state and local law enforcement integration into federal immigration enforcement operations seen in this context.
Whether the constitutionality of an information sharing requirement is absolute or whether it turns on how much the requirement effectively integrates state law enforcement into a federal regime is an interesting, and seemingly open, constitutional question that may prove dispositive in another case. Here, however, the Court need not reach a definitive answer because the Court finds no direct conflict between SB 54 and Section 1373.
The state statute expressly permits information sharing in accordance with Section 1373. Cal. Gov't Code § 7284.6(e). The functionality of this clause depends on whether Section 1373 is construed broadly to encompass information such as release dates and addresses or narrowly to include only one's immigration status or citizenship (i.e., category of presence in the United States, and whether an individual is a U.S. citizen, and if not, the country of citizenship).See City of Philadelphia, 309 F.Supp.3d at 332, 2018 WL 2725503, at *35.
Two district courts have held that Section 1373 must be interpreted narrowly. In Steinle v. City & Cnty. of San Francisco, the district court explained:
Nothing in 8 U.S.C. § 1373(a) addresses information concerning an inmate's release date. The statute, by its terms, governs only "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). If the Congress that enacted the Omnibus Consolidated Appropriations Act of 1997 (which included § 1373(a) ) had intended to bar all restriction of communication between local law enforcement and federal immigration authorities, or specifically to bar restrictions of sharing inmates' release *1102 dates, it could have included such language in the statute. It did not, and no plausible reading of "information regarding ... citizenship or immigration status" encompasses the release date of an undocumented inmate. Because the plain language of the statute is clear on this point, the Court has no occasion to consult legislative history.
230 F.Supp.3d 994, 1015 (N.D. Cal. 2017). Plaintiff urges the Court to limit its reliance on Steinle, which involved a negligence claim and in which the United States did not appear as a party. But, the district court in City of Philadelphia-a case in which the United States did appear-agreed with the Steinle court's analysis and concluded that the United States' broad interpretation "is simply impossible to square with the statutory text." 309 F.Supp.3d at 331, 2018 WL 2725503, at *34.
Both district courts rejected the analysis in Bologna v. City & Cnty. of San Francisco, the principal case Plaintiff cites for persuasive value. 192 Cal. App. 4th 429, 438-40, 121 Cal.Rptr.3d 406 (Ct. App. 2011). In analyzing a tort claim similar to the claim at issue in Steinle, the California Appellate Court characterized Section 1373 as invalidating "all restrictions on the voluntary exchange of immigration information between federal, state and local government entities and officials and federal immigration authorities." Id. at 438, 121 Cal.Rptr.3d 406. The Steinle court expressly disavowed this interpretation:
This Court is not bound by the state court's interpretation of federal law, and respectfully disagrees with the Bologna court's characterization of the scope of § 1373(a). "As [the Supreme Court has] repeatedly held, the authoritative statement is the statutory text, not the legislative history or any other extrinsic material. Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005). The Ninth Circuit has explained in some detail why the Constitution does not permit giving legislative effect to language found only in congressional reports that is not consistent with the language of a statute itself: The principle that committee report language has no binding legal effect is grounded in the text of the Constitution and in the structure of separated powers the Constitution created.... Treating legislative reports as binding law also undermines our constitutional structure of separated powers, because legislative reports do not come with the traditional and constitutionally-mandated political safeguards of legislation.
Steinle, 230 F.Supp.3d at 1014-15 ; see City of Philadelphia, 309 F.Supp.3d at 332, 2018 WL 2725503, at *35 (disagreeing with Bologna ).
The Court agrees with its fellow district courts that the plain meaning of Section 1373 limits its reach to information strictly pertaining to immigration status (i.e. what one's immigration status is) and does not include information like release dates and addresses. See Carson Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d 863, 878 (9th Cir. 2001) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, ... the sole function of the courts is to enforce it according to its terms.") (citation omitted).
A contrary interpretation would know no bounds. The phrase could conceivably mean "everything in a person's life." See Br. for City & Cnty. of San Francisco, as Amicus Curiae, ECF No. 112; see also *1103 State ex rel. Becerra v. Sessions, 284 F.Supp.3d 1015, 1035 (N.D. Cal. 2018) ("Under the INA, almost every bit of information about an individual could be relevant to status, particularly with respect to the right to asylum or as a defense to removal."). If Congress intended the statute to sweep so broadly, it could have used broader language or included a list to define the statute's scope. See, e.g., 8 U.S.C. § 1367(a)(2) (prohibiting immigration enforcement officers from "permit[ting] the use by or disclosure to anyone ... of any information which relates to an alien who is the beneficiary of an application for relief under [certain sections of the INA]"). One cannot naturally read "information regarding immigration status" to include the types of information Plaintiff now seeks to incorporate. While an immigrant's release date or home address might assist immigration enforcement officers in their endeavors, neither of these pieces of information have any bearing on one's immigration or citizenship status.
The parties offer competing precedent to aid the Court in interpreting the term "regarding." In Roach, the Ninth Circuit cautioned courts to refrain from interpreting the words "relate to," in an express preemption provision, too broadly. Roach v. Mail Handlers Ben. Plan, 298 F.3d 847 (9th Cir. 2002). The Circuit explained:
[I]n the context of a similarly worded preemption provision in the Employee Retirement Income Security Act (ERISA), the Supreme Court has explained that the words "relate to" cannot be taken too literally. "If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for 'really, universally, relations stop nowhere.' " Instead, "relates to" must be read in the context of the presumption that in fields of traditional state regulation "the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress."
Id. at 849-50 (citations omitted). Plaintiff urges the Court to, instead, focus on the Supreme Court's more recent interpretation of the term "respecting" in Lamar, Archer & Cofrin, LLP v. Appling. --- U.S. ----, 138 S.Ct. 1752, --- L.Ed.2d ---- (2018) (interpreting a provision in the Bankruptcy Code excepting debts obtained by fraud from discharge); Reply at 16. In Appling, the Court read the word "respecting" to have a broadening effect, instructing the Court to read the relevant text expansively. Id. at 1760. The Supreme Court also observed that a limiting construction would effectively read the term "respecting" out of the statute. Id. at 1761.
The Court finds the law in Appling sufficiently distinct from the law at issue here to limit the decision's instructional value. The Appling Court was not called upon to determine the preemptive effect of a federal statute and thus did not have presumptions against preemption to factor into its analysis. Further, the Appling Court held that "a statement about a single asset can be a 'statement respecting the debtor's financial condition.' " Id. at 1757. It reasoned, "[a] single asset has a direct relation to and impact on aggregate financial condition, so a statement about a single asset bears on a debtor's overall financial condition[.]" Id. at 1761. In contrast, as noted above, a person's address or release date has no direct relation to one's immigration or citizenship status.
Unlike the law in Appling, a narrow reading of the phrase "regarding immigration status" does not read "regarding" out of the statute. Plaintiff makes a similar argument by noting the omission of the term "regarding" in Section 1373(c) as compared to subsection (a). Mot. at 28. Section 1373(c) governs the obligation of federal immigration authorities in responding *1104 to inquiries from other government entities, and an official record of a person's citizenship or immigration status is presumably within their control. Opp'n at 12-13; Br. for City and Cnty. of San Francisco, as Amicus Curiae, at 9. Subsection (a) is directed toward government entities and their officers, who might possess information pertaining to an individual's immigration status but not hold an official record. The phrase "information regarding" thus serves a purpose even when the statute is read narrowly.
In any event, neither Roach nor Appling involved a provision like the one at issue in this case. The Court is convinced, based on the analysis above, that "information regarding immigration or citizenship status" does not include an immigrant's release date or home and work addresses. Section 1373 and the information sharing provisions of SB 54 do not directly conflict.
b. Obstacle Preemption
Apart from any direct conflict with Section 1373, Plaintiff argues that "the structure of the INA makes clear that states and localities are required to allow a basic level of information sharing" and cooperation with immigration enforcement. Mot. at 24. Plaintiff points to 8 U.S.C. § 1226(c)(1), a law that requires "mandatory detention" for certain immigrants after their release from criminal custody. It also cites 8 U.S.C. § 1231, which instructs the Attorney General to remove an immigrant within a period of 90 days after the immigrant has been ordered removed. 8 U.S.C. § 1231(a)(1)(A). For certain immigrants, detention during the removal period is mandatory. 8 U.S.C. § 1231(a)(2). With some exceptions "the Attorney General may not remove an [immigrant] who is sentenced to imprisonment until the [immigrant] is released from imprisonment. Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal." 8 U.S.C. § 1231(a)(4)(A).
Plaintiff argues that SB 54 undermines the system Congress designed. Mot. at 25. The limits on information sharing and transfers prevent or impede immigration enforcement from fulfilling its responsibilities regarding detention and removal because officers cannot arrest an immigrant upon the immigrant's release from custody and have a more difficult time finding immigrants after the fact without access to address information. Id. at 25-27. It contends that limiting adherence to transfer requests affords undocumented immigrants an opportunity to abscond. Plaintiff also points out that the subset of crimes for which SB 54 permits cooperation do not match the crimes under federal law that may serve as the predicate for removability or crimes for which detention is mandatory. Id. at 26. Additionally, it argues that requiring a judicial warrant or judicial finding of probable cause is irreconcilable with the INA, which establishes a system of civil administrative warrants as the basis for immigration arrest and removal. Id. at 30.
The Court disagrees and instead finds that California's decision not to assist federal immigration enforcement in its endeavors is not an "obstacle" to that enforcement effort. Plaintiff's argument that SB 54 makes immigration enforcement far more burdensome begs the question: more burdensome than what? The laws make enforcement more burdensome than it would be if state and local law enforcement provided immigration officers with their assistance. But refusing to help is not the same as impeding. If such were the rule, obstacle preemption could be used to commandeer state resources and subvert Tenth Amendment principles. Federal objectives will always be furthered if states offer to assist federal efforts. A state's *1105 decision not to assist in those activities will always make the federal object more difficult to attain than it would be otherwise. Standing aside does not equate to standing in the way.
Though not analyzing an obstacle preemption claim, the Seventh Circuit recently expressed a similar view with respect to decisions to withhold assistance. See City of Chicago v. Sessions, 888 F.3d 272 (7th Cir. 2018). The Circuit explained:
[T]he Attorney General repeatedly characterizes the issue as whether localities can be allowed to thwart federal law enforcement. That is a red herring. First, nothing in this case involves any affirmative interference with federal law enforcement at all, nor is there any interference whatsoever with federal immigration authorities. The only conduct at issue here is the refusal of the local law enforcement to aid in civil immigration enforcement through informing the federal authorities when persons are in their custody and providing access to those persons at the local law enforcement facility. Some localities might choose to cooperate with federal immigration efforts, and others may see such cooperation as impeding the community relationships necessary to identify and solve crimes. The choice as to how to devote law enforcement resources-including whether or not to use such resources to aid in federal immigration efforts-would traditionally be one left to state and local authorities.
City of Chicago, 888 F.3d at 282 (analyzing conditions imposed on federal grants). This common-sense distinction militates against adopting Plaintiff's perspective of the laws.
The Court is also wary of finding preemption in the absence of a "clear and manifest purpose of Congress" to supersede the States' police powers. See Arizona, 567 U.S. at 400, 132 S.Ct. 2492. California has not crossed over into the exclusively federal realm of determining who may enter and remain within the United States. SB 54 only governs the activities of the State's own law enforcement agencies. Although Congress clearly intends its immigration laws to exclusively regulate the subject of immigration and the activities of federal immigration enforcement officers, the Court sees no clear indication that Congress intended to displace the States' regulation of their own law enforcement agencies.
Despite Plaintiff's urgings, this case does not mirror Arizona v. United States. 567 U.S. 387, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). Arizona sought to impose additional rules and penalties upon individuals whom Congress had already imposed extensive, and exclusive, regulations. SB 54 does not add or subtract any rights or restrictions upon immigrants. Immigrants subject to removal remain subject to removal. SB 54, instead, directs the activities of state law enforcement, which Congress has not purported to regulate. Preemption is inappropriate here.
The Court's reluctance to glean such a purpose from the cited statutes is amplified because Congress indicated awareness that state law might be in tension with federal objectives and decided to tolerate those competing interests. See Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 166-67, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) ("The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them.") (citation and quotation marks omitted); see also Wyeth v. Levine, 555 U.S. 555, 575, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (quoting Bonito Boats and finding *1106 that a plaintiff's failure-to-warn claims were not preempted by federal law).
First, in the portions of the INA where Congress provided for cooperation between state and federal officials, it conditioned cooperation on compliance with state law. For instance, 8 U.S.C. § 1252c(a) authorizes state and local law enforcement officials to arrest and detain certain immigrants "to the extent permitted by relevant State and local law." Subsection (b) imposes an obligation on the Attorney General to cooperate with states in providing information that would assist state and local law enforcement, but does not impose any corollary obligations on state or local law enforcement. Similarly, 8 U.S.C. § 1357(g) authorizes the Attorney General to enter into agreements with the State to perform immigration officer functions, but only "to the extent consistent with State and local law." These conditions on cooperation indicate that Congress did not intend to preempt state law in this area.
Second, the primary mechanism-a "detainer"-by which immigration enforcement agents solicit release dates, transfers, and detention is a "request." See 8 C.F.R. § 287.7(a) ; Mot. at 25 ("To effectuate the INA's provisions, DHS issues an 'immigration detainer[.]' "). Even detainers soliciting "temporary detention" have been found to be a non-mandatory "request," despite the use of the word "shall" in the governing provision. 8 C.F.R. § 287.7(d) ; see Galarza v. Szalczyk, 745 F.3d 634, 640 (3d Cir. 2014) ("[N]o provisions of the [INA] authorize federal officials to command local or state officials to detain suspected aliens subject to removal."); see also Miranda-Olivares v. Clackamas Cnty., No. 3:12-CV-02317-ST, 2014 WL 1414305, at *7 (D. Or. Apr. 11, 2014) (following Galarza and noting that the Ninth Circuit has interpreted detainer letters, in the habeas corpus context, to be advisory in nature, not imposing-or even allowing-a warden to hold a detainee at the end of his term of imprisonment) (citing Garcia v. Taylor, 40 F.3d 299 (9th Cir. 1994) ). The voluntary nature of any response to these requests demonstrates that the federal government has not supplanted state discretion in this area.
Congress's deliberate decision to condition enforcement cooperation on consistency with state law, and the primary mechanism by which immigration officials seek law enforcement assistance being merely a "request," counsels against implied preemption in this area. A clear and manifest purpose to preempt state law is absent from these provisions.
Plaintiff argues that "Congress could have authorized the federal government to take custody of aliens immediately, without regard to the status of state criminal enforcement," Reply at 22-23, and that because it did not, the Court can infer that Congress intended states to cooperate with immigration law enforcement. The Court does not find such inference warranted. The Court can just as readily infer that Congress recognized the States' sovereign power to enforce their criminal laws and thought interference would upset the balance in powers. See Def. Reply to MTD at 1 ("It is not Congress that offers California the 'opportunity' to enforce state criminal laws[;] it is a right inherent in California's sovereignty."). Furthermore, it is often the case that an immigrant is not deemed removable or inadmissible until after they have been convicted of a crime. In these cases, state process is a predicate to federal action.
The Ninth Circuit's holding in Preap does not require a different outcome. Preap v. Johnson, 831 F.3d 1193 (9th Cir. 2016)cert. granted sub nom. Nielsen v. Preap, --- U.S. ----, 138 S.Ct. 1279, 200 L.Ed.2d 468 (2018). The Preap court held *1107 that the INA's mandatory detention provision only applies in cases when immigrants are "promptly" detained after being released from custody. Id. at 1197. Preap does not, however, require contemporaneous transfer for the mandatory detention provision to apply. And, a longer delay in securing custody does not preclude detention. It just makes detention a discretionary decision rather than a mandatory obligation. See id. at 1201 ; 8 U.S.C. § 1226. The Court finds that the operational challenges immigration enforcement agencies may have faced following the Preap decision do not alter the Court's conclusions with respect to Congress's clear and manifest purpose.
The Court further finds that Tenth Amendment and anticommandeering principles counsel against preemption. Though responding to requests for information and transferring individuals to federal custody may demand relatively little from state law enforcement, "[t]he issue of commandeering is not one of degree[.]" Galarza, 745 F.3d at 644 ; see Printz, 521 U.S. at 932, 117 S.Ct. 2365 ("But where, as here, it is the whole object of the law to direct the functioning of the state executive, and hence to compromise the structural framework of dual sovereignty, such a 'balancing' analysis is inappropriate. It is the very principle of separate state sovereignty that such a law offends, and no comparative assessment of the various interests can overcome that fundamental defect."). Under Printz, even enlisting state officers to perform discrete, ministerial tasks constitutes commandeering. Thus, it is highly unlikely that Congress could have made responses to requests seeking information and/or transfers of custody mandatory. See Cnty. of Santa Clara v. Trump, 250 F.Supp.3d 497, 534 (N.D. Cal. 2017), ("The Executive Order uses coercive means in an attempt to force states and local jurisdictions to honor civil detainer requests, which are voluntary 'requests' precisely because the federal government cannot command states to comply with them under the Tenth Amendment.") (focusing on requests for detention).
The Printz Court outlined several reasons why commandeering is problematic, which parallel California's concerns in enacting SB 54. The Court noted that commandeering shifts the costs of program implementation from the Federal Government to the states. Printz, 521 U.S. at 930, 117 S.Ct. 2365. The California Legislature enacted SB 54, in part, to divert California's resources away from supporting the Federal Government's enforcement efforts. It stated:
(d) Entangling state and local agencies with federal immigration enforcement programs diverts already limited resources and blurs the lines of accountability between local, state, and federal governments.
...
(f) This chapter seeks to ensure effective policing, to protect the safety, well-being, and constitutional rights of the people of California, and to direct the state's limited resources to matters of greatest concern to state and local governments.
Cal. Gov't Code § 7284.2 (Legislative findings and declarations). Defendant contends that working with immigration enforcement diverts resources from the States' priorities. Opp'n at 15-16; see e.g., Hart Decl., ECF No. 75-3, at 4 ("[W]e are often faced with staffing shortages that make even processing the additional paperwork related to detainers difficult.").
The Printz Court also explained that "even when States are not forced to absorb the costs of implementing a federal program, they are still put in the position of taking the blame for its burdensomeness and for its defects." 521 U.S. at 930, 117 S.Ct. 2365 ("And it will likely be the *1108 CLEO, not some federal official, who will be blamed for any error (even one in the designated federal database) that causes a purchaser to be mistakenly rejected.").
Here, when California assists federal immigration enforcement in finding and taking custody of immigrants, it risks being blamed for a federal agency's mistakes, errors, and discretionary decisions to pursue particular individuals or engage in particular enforcement practices. Under such a regime, federal priorities dictate state action, which affects the State's relationship with its constituency and that constituency's perception of its state government and law enforcement. Indeed, Defendant and amici highlight the impact these perceptions have on the community's relationship with local law enforcement. See Cal. Gov't Code § 7284.2 ("This trust is threatened when state and local agencies are entangled with federal immigration enforcement, with the result that immigrant community members fear approaching police when they are victims of, and witnesses to, crimes, seeking basic health services, or attending school, to the detriment of public safety and the well-being of all Californians."); Br. for Current and Former Prosecutors and Law Enforcement Leaders, as Amici Curiae, ECF No. 127; Br. for City of Los Angeles, as Amicus Curiae, ECF No. 128; Br. for Cnty. of Los Angeles, et al., as Amici Curiae, ECF No. 129.
Plaintiff discounts Defendant's interest in extracting itself from immigration enforcement, but fails to confront California's primary concern: the impact that state law enforcement's entanglement in immigration enforcement has on public safety. The historic police powers of the State include the suppression of violent crime and preservation of community safety. In this power inheres the authority to structure and influence the relationship between state law enforcement and the community it serves. The ebb of tensions between communities and the police underscores the delicate nature of this relationship. Even perceived collaboration with immigration enforcement could upset the balance California aims to achieve. It is therefore entirely reasonable for the State to determine that assisting immigration enforcement in any way, even in purportedly passive ways like releasing information and transferring custody, is a detrimental use of state law enforcement resources.
However, because Congress has not required states to assist in immigration enforcement-and has merely made the option available to them-this case presents a unique situation. As Judge Orrick observed in State ex rel. Becerra v. Sessions: "No cited authority holds that the scope of state sovereignty includes the power to forbid state or local employees from voluntarily complying with a federal program." 284 F.Supp.3d 1015, 1035 (N.D. Cal. 2018). The Second Circuit in City of New York concluded a state could not do so. City of New York v. United States, 179 F.3d 29, 35 (2nd Cir. 1999) ("We therefore hold that states do not retain under the Tenth Amendment an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs."). Nevertheless, the Supreme Court's holding in Murphy undercuts portions of the Second Circuit's reasoning and calls its conclusion into question. Compare City of New York, 179 F.3d at 35 (distinguishing Section 1373 from the laws in Printz and New York because the Section does not compel state and local governments to enact or administer any federal regulatory program or conscript them into federal service) with Murphy, 138 S.Ct. at 1478 (holding the anticommandeering rule applies to Congressional prohibitions on state actions in addition to commands to take affirmative actions). Further, the Second *1109 Circuit's broad proclamations may be limited to the specific City Executive Order at issue, procedural posture, and record in that case. See Br. for Admin. L., Const. L., Crim. L., and Immigr. L. Scholars, as Amici Curiae, ECF No. 132, at 13 (distinguishing City of New York ). Regardless, the City of New York holding is not binding on this Court.
The Court finds that a Congressional mandate prohibiting states from restricting their law enforcement agencies' involvement in immigration enforcement activities-apart from, perhaps, a narrowly drawn information sharing provision-would likely violate the Tenth Amendment. See City of Chicago v. Sessions, 888 F.3d 272, 282 (7th Cir. 2018) (stating, in dicta: "The choice as to how to devote law enforcement resources-including whether or not to use such resources to aid in federal immigration efforts-would traditionally be one left to state and local authorities."); Koog v. United States, 79 F.3d 452, 460 (5th Cir. 1996) ("Whatever the outer limits of state sovereignty may be, it surely encompasses the right to set the duties of office for state-created officials and to regulate the internal affairs of governmental bodies."). The Tenth Amendment analysis in Murphy supports this conclusion. Murphy, 138 S.Ct. at 1478 (a prohibition on state legislation violates the anticommandeering rule), 1481 ("[P]reemption is based on a federal law that regulates the conduct of private actors, not States."); see New York, 505 U.S. at 166, 112 S.Ct. 2408 ("[T]he Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States."). If Congress lacks the authority to direct state action in this manner, then preemption cannot and should not be used to achieve the same result. The Supremacy Clause requires courts to hold federal law supreme when Congress acts pursuant to one of its enumerated powers; those powers do not include the authority to dictate a state's law enforcement policies.
Having concluded that California may restrict the assistance its law enforcement agencies provide immigration enforcement, the Court finds California's choice to cooperate in certain circumstances permissible. See Cal. Gov't Code § 7284.6(a)(1)(C) (allowing California law enforcement agencies to provide information regarding a person's release date when that person has been convicted of certain crimes), § 7284(a)(4) (permitting California law enforcement agencies to transfer individuals to immigration authorities when authorized by a judicial warrant or judicial probable cause determination, or when the individual has been convicted of certain crimes). As the Seventh Circuit explained:
[F]or the persons most likely to present a threat to the community, City law enforcement authorities will cooperate with ICE officials even in "sanctuary" cities. The decision to coordinate in such circumstances, and to refuse such coordination where the threat posed by the individual is lesser, reflects the decision by the state and local authorities as how best to further the law enforcement objectives of their communities with the resources at their disposal.
City of Chicago, 888 F.3d at 281. While the Court, again, acknowledges that City of Chicago involved different claims than those presented here, the Court agrees with the assessment. Just as the State may restrict the assistance its law enforcement officers provide immigration enforcement, the State may choose to outline exceptions to that rule in accordance with its own law enforcement priorities and concerns. For example, California is concerned with the monetary liability law enforcement agencies may face if they maintain custody of an individual for purposes of transfer without a judicial warrant or probable cause *1110 determination justifying that custody. See Roy v. Cnty. of Los Angeles, No. CV 12-09012-AB (FFMx), 2018 WL 914773, at *22-24 (C.D. Cal. Feb. 7, 2018) ("The LASD officers have no authority to arrest individuals for civil immigration offenses, and thus, detaining individuals beyond their date for release violated the individuals' Fourth Amendment rights."); Br. for States and the District of Columbia, as Amici Curiae, ECF No. 139 ("SB 54's [warrant requirement] is a reasonable way to protect the state and its law enforcement agencies from monetary liability for unlawfully detaining individuals requested to be transferred to federal immigration authorities after their period of state custody expires."). The California Legislature expressed this concern when it passed SB 54:
State and local participation in federal immigration enforcement programs also raises constitutional concerns, including the prospect that California residents could be detained in violation of the Fourth Amendment to the United States Constitution, targeted on the basis of race or ethnicity in violation of the Equal Protection Clause, or denied access to education based on immigration status. See Sanchez Ochoa v. Campbell, et al. (E.D. Wash. 2017) 2017 WL 3476777 [266 F.Supp.3d 1237] ; Trujillo [Santoyo] Santoya v. United States, et al. (W.D. Tex. 2017) 2017 WL 2896021 ; Moreno v. Napolitano (N.D. Ill. 2016) 213 F.Supp.3d 999 ; Morales v. Chadbourne (1st Cir. 2015) 793 F.3d 208 ; Miranda-Olivares v. Clackamas County (D. Or. 2014) 2014 WL 1414305 ; Galarza v. Szalczyk (3d Cir. 2014) 745 F.3d 634.
Cal. Gov't Code § 7284.2(e). Because California's directive to its law enforcement agencies is not preempted, the Court finds its determination to make certain exceptions to the rule also survives preemption analysis.
c. Intergovernmental Immunity
The intergovernmental immunity doctrine has no clear application to SB 54. SB 54 regulates state law enforcement; it does not directly regulate federal immigration authorities.
Plaintiff argues the information sharing and transfer restrictions "apply only to requests made by federal entities[.]" Mot. at 31. It claims that although "the statute defines 'immigration authorities' to include, in addition to federal officers, 'state, or local officers, employees or persons performing immigration enforcement functions,' it also defines 'immigration enforcement' to mean 'any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any federal civil immigration law, and also includes any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any federal criminal immigration law that penalizes a person's presence in, entry, or reentry to, or employment in, the United States.' " Id. (citing the definitions in Cal. Gov't Code § 7284.4 ).
The Court is not convinced that the intergovernmental immunity doctrine extends to the State's regulation over the activities of its own law enforcement and decision to restrict assistance with some federal endeavors. None of the cases cited in the parties' briefs involve an analogous regulation. The preemption analysis above thus counsels against expanding the doctrine to the present situation. North Dakota v. United States, 495 U.S. 423, 435, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990) ("The Court has more recently adopted a functional approach to claims of governmental immunity, accommodating of the full range of each sovereign's legislative authority and respectful of the primary role of Congress in resolving conflicts between the National and State Governments.").
*1111 Even if the doctrine might arguably apply to this situation, Plaintiff has not shown it is likely to succeed on this claim. First, Plaintiff has not shown that the laws uniquely burden federal immigration authorities. The information sharing provisions permit sharing when the information is available to the public. Cal. Gov't Code § 7284.6(a)(1)(C)-(D). Plaintiff has not identified any examples of similarly situated authorities (i.e., civil law enforcement agencies) that the State treats better than it does federal immigration authorities. And while the Court agrees with Plaintiff that "federal, state, or local officer[s] ... performing immigration enforcement functions" boils down to federal immigration enforcement, see Cal. Gov't Code § 7284.4, the Court finds the discrimination-if any-is justified by California's choice to divert its resources away from assisting immigration enforcement efforts. As explained in detail above, the purported "burden" here is California's decision not to help the Federal government implement its immigration enforcement regime. The State retains the power to make this choice and the concerns that led California to adopt this policy justify any differential treatment that results.
For all of the reasons set forth in Part III.A.3 of this Order, the Court finds that Plaintiff is not likely to succeed on the merits of its SB 54 claim and its motion for a preliminary injunction as to this statute is denied.
B. Preliminary Injunction Equitable Factors
Each party submitted evidence showing hardships to their sovereign interests and their constituencies should the Court fail to decide this Motion in their favor. See Exhs. to Mot. and Reply, ECF Nos. 2-2-5, 46, 171-1-25, 173, 178; Exhs. to Opp'n, ECF Nos. 75, 78, 81, 83. Many of the amici curiae also identified harms that would befall themselves or their constituencies because of this Court's Order. The parties' interests largely hang in balance, each seeking to vindicate what it-and its supporters-view as critical public policy objectives. These harms are not susceptible to remediation through damages; each side faces much more than mere economic loss. See Ariz. Dream Act Coal. v. Brewer, 757 F.3d 1053, 1068 (9th Cir. 2014) ("Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages.").
"[A]n alleged constitutional infringement will often alone constitute irreparable harm." United States v. Arizona, 641 F.3d 339, 366 (9th Cir. 2011) (citation omitted), rev'd in part on other grounds, 567 U.S. 387, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). "It is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law .... In such circumstances, the interest of preserving the Supremacy Clause is paramount." Id. (quoting Cal. Pharmacists Ass'n v. Maxwell-Jolly, 563 F.3d 847, 852-53 (9th Cir. 2009) ); see Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 559 F.3d 1046, 1059-60 (9th Cir. 2009) ("Similarly, while we do not denigrate the public interest represented by the Ports, that must be balanced against the public interest represented in [Congress's] decision to deregulate the motor carrier industry, and the Constitution's declaration that federal law is to be supreme.").
For the state laws which the Court found no likelihood that Plaintiff will succeed on its claims- California Government Code Sections 12532 (AB 103), 7284.6(a)(1)(C) & (D), and 7284.6(a)(4) (SB 54), and California Labor Code Section 90.2 (AB 450)-no injunction will issue. "Because it is a threshold inquiry, when a plaintiff has failed to show the likelihood of success on the merits, [the Court] need not consider the remaining three Winter elements."
*1112 Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015) (citation and quotation marks omitted). The Court will not find an irreparable injury where it has not found an underlying constitutional infringement. See Goldie's Bookstore, Inc. v. Super. Ct. of Cal., 739 F.2d 466, 472 (9th Cir. 1984) ("In this case, however, the constitutional claim is too tenuous to support our affirmance on [the] basis [of irreparable harm].").
As to California Government Code Sections 7285.1 and 7285.2 and California Labor Code Section 1019.2, the Court presumes that Plaintiff will suffer irreparable harm based on the constitutional violations identified above. The equitable considerations favor an injunction in such circumstances. See United States v. Alabama, 691 F.3d 1269, 1301 (11th Cir. 2012) ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations. Frustration of federal statutes and prerogatives are not in the public interest, and we discern no harm from the state's nonenforcement of invalid legislation."). The Court therefore enjoins enforcement of these provisions as to private employers, as set forth in the Order below.
C. Conclusion
This Court has gone to great lengths to explain the legal grounds for its opinion. This Order hopefully will not be viewed through a political lens and this Court expresses no views on the soundness of the policies or statutes involved in this lawsuit. There is no place for politics in our judicial system and this one opinion will neither define nor solve the complicated immigration issues currently facing our Nation.
As noted in the Introduction to this Order, this case is about the proper application of constitutional principles to a specific factual situation. The Court reached its decision only after a careful and considered application of legal precedent. The Court did so without concern for any possible political consequences. It is a luxury, of course, that members of the other two branches of government do not share. But if there is going to be a long-term solution to the problems our country faces with respect to immigration policy, it can only come from our legislative and executive branches. It cannot and will not come from piecemeal opinions issued by the judicial branch. Accordingly, this Court joins the ever-growing chorus of Federal Judges in urging our elected officials to set aside the partisan and polarizing politics dominating the current immigration debate and work in a cooperative and bi-partisan fashion toward drafting and passing legislation that addresses this critical political issue. Our Nation deserves it. Our Constitution demands it.
IV. ORDER
For the reasons set forth above, the Court DENIES IN PART AND GRANTS IN PART Plaintiff's Motion for Preliminary Injunction.
The Court DENIES Plaintiff's Motion to enjoin California Government Code Sections 12532, 7284.6(a)(1)(C) & (D), and 7284.6(a)(4), and California Labor Code Section 90.2.
The Court GRANTS Plaintiff's Motion and preliminarily enjoins the State of California, Governor Brown, and Attorney General Becerra from enforcing California Government Code Sections 7285.1 and 7285.2 and California Labor Code Section 1019.2(a) & (b) as applied to private employers.
IT IS SO ORDERED.

Because Edmund Gerald Brown Jr., Governor of California, and Xavier Becerra, Attorney General of California, are sued in their official capacities only, the Court will address all three named defendants as "California" or "Defendant."

Unless quoting from another source, this Court will use the term "immigrant" when referring to "any person not a citizen or national of the United States." Cf. 8 U.S.C § 1101(a)(3) (defining "alien"). For persons who have not obtained lawful immigration or citizenship status, the Court will use the term "undocumented immigrants."

In its Complaint, Plaintiff identifies another statute, 8 U.S.C. § 1644, that contains the same prohibition as Section 1373(a). Plaintiff does not discuss Section 1644 in its Motion.